Louis A. Klitzner and Isabel S. Klitzner v. Commissioner. Harry F. Leshnower and Ruth S. Leshnower v. Commissioner.
Klitzner v. Commissioner
Docket Nos. 4768-62, 4769-62.
United States Tax Court
T.C. Memo 1964-263; 1964 Tax Ct. Memo LEXIS 75; 23 T.C.M. (CCH) 1601; T.C.M. (RIA) 64263; October 6, 1964
W. Stuart McCloy, for the petitioners. J. Larry Broyles, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined *76 deficiencies in petitioners' income tax for the years and in the amounts as follows: Petitioner
Docket No.
Year ended
Deficiency
Louis A. Klitzner and Isabel S. Klitzner
4768-62
Feb. 29, 1960
$5,911.09
Feb. 28, 1961
9,088.37
Harry F. Leshnower and Ruth S. Leshnower
4769-62
Dec. 31, 1959
3,157.30
Dec. 31, 1960
2,143.79
The cases were consolidated for trial and decision. The sole issue presented for our decision is the correctness of the respondent's action in determining that certain payments made to petitioners during the years involved pursuant to a covenant not to compete constitute ordinary income. Findings of Fact The stipulated facts are found as stipulated. Petitioners Louis A. Klitzner and Isabel S. Klitzner, residents of Memphis, Tennessee, filed their joint income tax returns for the fiscal years ended February 29, 1960, and February 28, 1961, with the director at Nashville, Tennessee. Petitioners Harry F. Leshnower and Ruth S. Leshnower, likewise residents of Memphis, Tennessee, filed their joint income tax returns for 1959 and 1960 with the director at Nashville, Tennessee. As hereinafter used, petitioners refers *77 to Louis A. Klitzner and Harry F. Leshnower. On or about September 25, 1952, petitioners, together with Robert Breakstone, formed a partnership known as American Linen Service Company, sometimes hereinafter referred to as American or the partnership. Their respective interests in the partnership were: Klitzner, 45 percent; Breakstone, 45 percent; and Leshnower, 10 percent. The partners, operating under the name of American Linen Service Company, conducted a linen rental service business furnishing uniforms and garments to various businesses in the Memphis, Tennessee, area. As a separate branch of its operations, American also engaged in an industrial rental laundry service under the name of Industrial Coverall Service Company which furnished industrial coveralls to manufacturers and service stations in the Memphis area. In the latter part of 1952 and during 1953 and 1954, American employed approximately 100 employees in its entire operation. It owned its own laundry equipment, automotive equipment, linen, coveralls, and other garments. It was the practice of the partnership during those years to maintain customer lists which were utilized by its routemen in conducting a pickup *78 and delivery service. On or about October 13, 1954, the partners executed an agreement under which Robert Breakstone was to withdraw from the partnership as of February 28, 1955. Under the terms of the agreement petitioners were to retain the linen rental service business and the firm name American Linen Service Company. The agreement also provided that the business of the Industrial Coverall Service was to be withdrawn from the partnership by Breakstone, together with certain insurance policies and real estate, in complete liquidation of his interest in the partnership. He was to operate the Industrial Coverall Service as his sole and separate enterprise. Under the above-described agreement Klitzner and Leshnower agreed not to compete with Breakstone in the industrial laundry rental service for a period of 10 years. The reason for their covenant was described in the agreement as follows: In recognition of the highly competitive nature of the businesses conducted by the partnership, of the standing which the respective parties have in the trade, and of the fact that Breakstone, on the one hand, and Klitzner and Leshnower, on the other hand would suffer considerable damage and *79 irreparable harm from competition with each other * * * The covenant was not supported by any stated cash consideration. On March 1, 1955, Breakstone executed a negative covenant agreement under which in consideration of the payment of $50,000, in equal monthly installments of $416.67, Breakstone agreed that he would not directly or indirectly compete with American in the linen rental business in the area served by that concern for a period of 10 years. The full amount of the $5,000 annual payments made by Klitzner and Leshnower to Breakstone under the covenant, referred to last above, was deducted by American on its books as a business expense for each of its fiscal years ended February 29, 1956, through February 28, 1959. On March 1, 1955, petitioners amended their partnership agreement to provide that Klitzner's partnership interest would be 65 percent and Leshnower's would be 35 percent. Textile Maintenance, Inc., sometimes hereinafter referred to as Textile, was a Tennessee corporation formed on March 21, 1955. Klitzner owned 65 percent of its outstanding stock and Leshnower owned 35 percent thereof. Upon the formation of Textile, the laundry equipment and machinery *80 formerly owned by American was transferred to Textile. Thereafter, Textile laundered and cleaned the linen used by American for a fee. American Rental Corporation, sometimes hereinafter referred to as Rental, was a Tennessee corporation formed on February 28, 1957. Klitzner owned 65 percent of the outstanding stock in Rental and Leshnower owned 35 percent. Upon the formation of Rental, the automobiles and trucks formerly owned by American and which had been used in the pickup and delivery of linen were transferred to the corporation. After this transfer of assets to Rental, the automobiles and trucks were leased back to American. In 1958 there was one other linen service business operating in competition with American in the Memphis area. By 1958 American was serving approximately 1,000 customers in the metropolitan Memphis area. American, Rental, and Textile employed a total of approximately 100 employees. Klitzner was in charge of sales, service, and administration. Leshnower was in charge of plant production. In late 1957 petitioners contacted National Linen Service Corporation of Atlanta, Georgia, sometimes hereinafter referred to as National, in regard to the possibility *81 of selling the linen service business conducted by American, Rental, and Textile to National. In February 1958, negotiations between petitioners and National for the purchase of the linen supply business began. Klitzner and Leshnower were each represented by counsel, as was National. In all, five or six conferences were held in Memphis and Atlanta. Petitioners were present at several of the conferences, Klitzner, himself, participating in all but two or three of the meetings. T. G. Ware, secretary-treasurer of National, was also present at one conference. The first meeting between the parties was held in Memphis in late February 1958. At that time the proposed purchase was discussed in general terms between National's representative and Klitzner, Leshnower, and their counsel. During a meeting held in March 1958, National's representative insisted that Klitzner and Leshnower execute a covenant to refrain from competition in the linen supply business in Memphis for 10 years. In return for the execution of such a covenant, National's representative offered to pay petitioners $250,000 over the 10-year period. During the ensuing negotiations the covenant, its terms, its form, and *82 the consideration to be paid therefor, were the subject of extensive and detailed discussion between the parties. Between March 18, 1958, and early May 1958, other conferences between the parties were held. During one of these meetings the tax treatment to be accorded the covenant was discussed. Counsel for Klitzner and Leshnower advised them that the form in which the restrictive covenant was to be drafted with the allocation of a specific sum to be paid over a period of 10 years would very likely result in ordinary income to them. Counsel for National pointed out that since the amount was to be paid petitioners over a 10-year period, the income tax impact on them would not be severe. He also stated that the tax treatment of the covenant was of critical importance to National. He made it clear that one of the important conditions of the sale was setting up the covenant in a manner to assure as nearly as possible that the purchaser could obtain a business deduction on the payments made to petitioners. At a meeting held prior to May 19, 1958, National agreed to pay Klitzner and Leshnower $375,000 for their covenant as a result of a statement made by their counsel that they would *83 not accept the spreading of only $250,000 over a 10-year period. Upon raising the price for the covenant $125,000, National's attorney emphasized that each yearly payment of $37,500 was to be contingent upon petitioners' continuing performance of the terms of the covenant. At a meeting held on May 12, 1958, the directors of Textile adopted a plan of complete liquidation under section 337 of the Internal Revenue Code of 1954. The directors also passed a resolution calling for the corporation to enter into a contract to sell all of its laundry equipment and machinery to National. At a meeting held on May 13, 1958, the directors of Rental adopted a plan of complete liquidation pursuant to section 337 of the 1954 Code. The directors also passed a resolution calling for the corporation to enter into a contract to sell all of its trucks and delivery equipment to National. On May 19, 1958, National made, by letter, an offer to purchase American. The offer and its acceptance by petitioners was as follows: Upon the basis of our investigation of your business and predicated upon our valuations: Cabinets, new and used, on hand
at your plant and/or in the
hands of customers and/or in
transit
$ 50,000.00
Used linens on hand at your
plant and/or in the hands of
customers
240,000.00
New unused linens and linen sup-
plies at your plant and in
usable condition and in un-
broken packages, at 55% of
Invoice Price (estimated)
85,000.00
Accounts Receivable
72,000.00
Good-Will including the use of
all trade-names, trade routes,
contracts with customers and
employees, lists of potential
customers, books, records, and
documents pertaining to the
business (if average monthly
volume is $60,000.00)
115,000.00
Furniture and Fixtures
15,000.00
Leasehold Improvements
20,000.00
*84 we offer to purchase your partnership interests in American Linen Service Company for the sum of $597,000.00. We shall have the right to adjust the purchase price for any substantial variation which occurs or is revealed prior to the closing date to be agreed upon. If you accept this offer, as indicated by your execution of the copy hereof, we will refer the matter to our counsel for the preparation of a more formal document consistent with the above and containing such additional provisions for our protection as he may deem advisable and not inconsistent with the foregoing. Very truly yours, NATIONAL LINEN SERVICE CORPORATION
By: (Signed) Milton Weinstein President The undersigned accept the foregoing offer to purchase their partnership interests subject to approval by them of the formal document referred to therein. This 20th day of May, 1958. (Signed) Louis Klitzner, Louis Klitzner (Signed) Harry Leshnower, Harry Leshnower Operating American Linen Service Company
On May 26, 1958, a formal offer and acceptance was executed by National as purchaser of American and by Klitzner and Leshnower as sellers of American. The pertinent portions of this document stated: *85 Atlanta, Georgia, May 26th, 1958. TO: Messrs. Louis Klitzner and Harry Leshnower operating American Linen Service Company, Memphis, Tennessee. Gentlemen: The undersigned, NATIONAL LINEN SERVICE CORPORATION (hereinafter referred to as "National"), offers to purchase the partnership interests of LOUIS KLITZNER and HARRY LESHNOWER, (hereinafter referred to as "Sellers") in the partnership known as AMERICAN LINEN SERVICE COMPANY, (hereinafter referred to as "American"), engaged in the linen supply business in the City of Memphis, Shelby County, Tennessee, for a total cash purchase price of FIVE HUNDRED SEVENTY-SEVEN THOUSAND ($577,000) AND 00/100; DOLLARS, predicated upon our allocation, as follows: Physical assets including, without limiting the generality of the following specification: All cabinets located at or utilized
in connection with the business
of the partnership, including
those on hand at the plant, in
the hands of customers, on or-
der, or in transit; all used lin-
ens located at or utilized in
connection with the business of
the partnership including those
on hand at the plant and/or in
the hands of customers, all new
unused linens and linen sup-
plies on hand at the partner-
ship plant and in usable condi-
tion and in unbroken packages
at closing date; furniture and
fixtures
$390,000.00
Accounts Receivable arising from
the operations of the partner-
ship (Exhibit "A" hereto) (to
be adjusted as of the closing
date) but estimated at
72,000.00
Good-Will of the partnership,
which shall include the right to
use the names "American Linen
Service Company" and "Ten-
nessee Sanitary Towel Com-
pany" and any and all other
trade-names used by the Sellers
in the operation of their linen
supply business in Memphis and
its environs; and also all trade
routes, contracts with customers,
and contracts with employees,
and lists of potential customers
of the partnership; all books,
records and documents pertain-
ing to or connected with said
partnership business
$115,000.00
Total
$577,000.00
*86 This offer is subject to the following terms and conditions: 1. (a) Closing Date and Place - June 2, 1958, at Memphis, Tennessee. (b) The Good-Will included in the purchase price is predicated upon the representations of Sellers that their average monthly volume of bona fide linen supply business for the six (6) months preceding May 1, 1958, was SIXTY THOUSAND ($60,000.00) AND 00/100 DOLLARS, National shall have the right to check the books and records of Sellers, and it is expressly understood that for each ONE ($1.00) AND 00/100 DOLLAR of average monthly volume less than SIXTY THOUSAND ($60,000.00) AND 00/100 DOLLARS volume of bona fide linen supply business which Seller's books and records reveal, the good-will item shall be reduced by the sum of THIRTEEN ($13.00) AND 00/100 DOLLARS. * * * 4. COVENANTS: Sellers shall agree: * * *
(b) That for the separate consideration stated, Sellers will execute an agreement with National that for the payment to Sellers of the sum of THIRTY-SEVEN THOUSAND FIVE HUNDRED ($37,500.00) AND 00/100 DOLLARS annually during the term of such agreement, they will not for a period of ten (10) years from the date of the consummation *87 of this sale, for themselves, on or behalf of any other person, persons, partnership, or company, solicit, divert, or take away any of the business or customers or patronage of National which customers were served by American during any part of three (3) years immediately prior to June 1, 1958, and that during said period of ten (10) years from June 1, 1958, they will not, directly or indirectly, for themselves, or on behalf of any other person, persons, partnership, or corporation, engage in the linen service business in the area in which American conducted said linen service business during any part of three (3) years prior to June 1, 1958. Said agreement shall bind Sellers jointly and severally. * * *
Very truly yours, NATIONAL LINEN SERVICE CORPORATION
BY: (signed) Milton Weinstein We do hereby accept the foregoing offer subject to all of the conditions and obligations set forth therein, expressly adopting all representations and warranties, and assuming and agreeing to perform all obligations of Seller and/or American as specified in the foregoing offer, provided that in accepting the foregoing offer to purchase the undersigneds' partnership interests, the undersigned *88 make no representations concerning the value of specific assets except that the undersigned to recognize that the good-will is based upon their representation of volume and subject to modification as set forth in Paragraph 1(b) of said offer. This 26 day of May, 1958. (signed) Louis Klitzner, Louis Klitzner (signed) Harry Leshnower, Harry Leshnower Prior to June 2, 1958, National dispatched its vice president in charge of engineering to examine, appraise, and evaluate the laundry machinery owned by Textile and the delivery equipment owned by Rental. On June 2, 1958, Klitzner and Leshnower each executed separate bills of sale transferring their interest in the tangible and intangible assets of American. The bill of sale executed by Klitzner stated as follows: TENNESSEE, COUNTY OF SHELBY: BILL OF SALE KNOW ALL MEN BY THESE PRESENTS: That for and in consideration of the sum of $354,356.18 DOLLARS, the undersigned, LOUIS A. KLITZNER, a resident of the State of Tennessee, County of Shelby, City of Memphis, does hereby sell, assign, transfer, and convey unto NATIONAL LINEN SERVICE CORPORATION, all of the undersigned's interest in that certain partnership engaged in the linen *89 supply business in the City of Memphis, Shelby County, Tennessee, and known as "American Linen Service Company." TO HAVE AND TO HOLD all and singular the said property of the undersigned to the said NATIONAL LINEN SERVICE CORPORATION, its successors and assigns to their own use and behoof forever. And the undersigned does hereby warrant: (a) That the undersigned is the lawful owner of said interest in said partnership; and (b) That all of the assets of said partnership consist of the following items: All cabinets located at or utilized in connection with the business of the partnership, including those on hand at the plant; in the hands of customers; on order; or in transit. All used linens located at or utilized in connection with the business of the partnership, including those on hand at the plant and/or in the hands of customers. All new unused linens and linen supplies on hand at the partnership plant and in usable condition and in unbroken packages at closing date. Accounts Receivable arising from the operations of the partnership. Good-Will of the partnership, which shall include the right to use the names "American Linen Supply Company" and "Tennessee Sanitary *90 Towel Company" and any and all other trade-names used by the Sellers in the operation of their linen supply business in Memphis and its environs; and also all trade-routes, contracts with customers, and contracts with employees, and lists of potential customers of the partnership; all books, records, and documents pertaining to or connected with said partnership business. Furniture and Fixtures. Leasehold Improvements. (c) That the said assets and the undersigned's interest in said partnership are free from all liens and encumbrances of any kind or nature. (d) That the said partnership, American Linen Service Company, as of this date, has no liabilities, contracts, debts, or claims against it of any kind or nature. IN WITNESS WHEREOF, the undersigned, LOUIS A. KLITZNER, has hereunto set his hand and affixed his seal on this, the 2nd day of June, 1958. (signed) Louis A. Klitzner (L. S.) Louis A. Klitzner Signed, sealed, and delivered in the presence of: (signed) Sam A. Myar, Jr. (signed) P. K. Seidman The bill of sale executed by Leshnower was identical in all respects with that signed by Klitzner except that the name was changed and the stated consideration for *91 his share of American was $190,807.18. On June 2, 1958, Klitzner and Leshnower entered into a covenant not to compete with National. The terms of this covenant, the form of the affidavit to be executed, and the direction of payment were as follows: RESTRICTIVE COVENANT TENNESSEE, COUNTY OF SHELBY] THIS AGREEMENT, Made and entered into this, the 2nd day of June, 1958, by and between LOUIS A. KLITZNER and HARRY F. LESHNOWER, residents of Memphis, Shelby County, Tennessee, both jointly and severally, hereinafter referred to as "Covenantors", and NATIONAL LINEN SERVICE CORPORATION, a corporation of the State of Delaware, hereinafter referred to as "National"; WITNESSETH: WHEREAS, the parties hereto did enter into a contract dated the 26th day of May, 1958, for the sale by Covenantors of their interests in that certain partnership known as "American Linen Service Company", being a corporation engaged in the linen supply business in the City of Memphis, Shelby County, Tennessee, and its environs, to National; and, WHEREAS, under the terms of said contract, the Covenantors agreed that for a consideration provided for, the undersigned, and each of them would enter into a restrictive *92 covenant contract with National; NOW, THEREFORE, for and in consideration of the premises, and the mutual covenants hereinafter set out, IT IS AGREED: 1. Covenantors, and each of them, jointly and severally, do hereby agree that for a period of ten (10) years from June 2, 1958, they will not, individually or jointly, directly nor indirectly, for themselves, or on behalf of any other person, persons, partnership, or corporation, solicit, divert, or take away any of the business, or customers, or patronage of National, which customers were served by Covenantors, individually or as a partnership under the name and style of "American Linen Service Company" or "Tennessee Sanitary Towel Service" during any part of the two (2) years immediately prior to June 1, 1958; and the undersigned, and each of them, both jointly and severally, do further agree that during said period of ten (10) years from June 1, 1958, they will not, directly nor indirectly, for themselves, or on behalf of any other person, persons, partnership, or corporation, engage in the linen service business in the area in which the partnership known as "American Linen Service Company" conducted a linen service business *93 during any part of the two (2) years prior to June 1, 1958. 2. National agrees that for each year that the Covenantors comply with and perform the obligations set forth in Paragraph (1) hereof, up to but not exceeding ten (10) years from June 1, 1958, National will pay to Covenantors the sum of THIRTY-SEVEN THOUSAND FIVE HUNDRED ($37,500.00) AND 00/100 DOLLARS upon proof satisfactory to National that the Covenantors have complied with and performed the obligations set forth in Paragraph (1) hereof, which proof shall include, but not be limited to, the execution and delivery by each of the undersigned of the attached affidavit. The first payment shall be made in the sum of THIRTY-SEVEN THOUSAND FIVE HUNDRED ($37,500.00) AND 00/100 DOLLARS on June 1, 1959, and thereafter in the amounts of EIGHTEEN THOUSAND SEVEN HUNDRED FIFTY ($18,750.00) AND 00/100 DOLLARS on the 1st day of June and the 1st day of December of each year beginning June 1, 1960, such payments also to be conditioned only upon the proof, as hereinbefore set forth, that Covenantors have complied with and performed the obligations set forth in Paragraph (1) hereof. 3. Covenantors shall have the right, to be exercised *94 by an instrument in writing directed to National, substantially as set forth in Exhibit "B" hereto, to request that the sum payable each year shall be divided between the covenantors in such manner as Covenantors may decide, and after receipt of any such notice, it shall be presumed that payment, as therein directed, shall continue until a new and different notice is given by Covenantors. 4. In the event of any breach of the provisions of Paragraph (1) hereof by either of the Covenantors, then all obligations of National to make any further payment to the Covenantors, or either of them, shall cease and determine forever, and National shall be under no further obligation to the Covenantors, or either of them; provided, however, that if either or both of the Covenantors should die before the end of said ten (10) year period, and if at the time of his death neither Covenantor had committed any breach of Paragraph (1) hereof, then the payment to which said deceased Covenantor would have been entitled under the terms of this contract had he lived and complied with the provisions of said Paragraph (1) hereof, shall be paid to the estate of said deceased Covenantor, but only semi-annually, *95 as provided in Paragraph (2) hereof, and only during the continued performance of the obligations of Paragraph (1) hereof by such Covenantor as may survive. IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and affixed their seals, National Linen Service Corporation acting through its duly authorized officers, on this, the day and year first above written. (signed) Louis A. Klitzner (L. S.) Louis A. Klitzner (signed) Harry F. Leshnower (L. S.) Harry F. Leshnower Covenantors NATIONAL LINEN SERVICE CORPORATION
By: (signed) Milton Weinstein President ATTEST: (SEAL) By: (signed) T. G. Ware Secretary Signed, sealed, and delivered in the presence of: (signed) Mary W. Shires (signed) T. W. Beiter, Jr. TENNESSEE, COUNTY OF SHELBY] Personally appeared before the undersigned Notary Public, duly authorized to administer oaths under the law, LOUIS A. KLITZNER and HARRY F. LESHNOWER, who, first being duly sworn, do, jointly and severally, depose and state: 1. That during the period beginning the day of , 19 , and ending the day of , 19 , neither of the undersigned have, directly nor indirectly, solicited or attempted to solicit, diverted, or attempted *96 to divert away from NATIONAL LINEN SERVICE CORPORATION, any linen supply business of customers served by AMERICAN LINEN SERVICE COMPANY during any part of three (3) years prior to June 1, 1958, and neither of the undersigned have for said period, directly nor indirectly, for themselves, or on behalf of any other person, persons, partnership, or corporation, engaged in the linen supply business in the area served by AMERICAN LINEN SERVICE COMPANY during any part of the three (3) years prior to June 1, 1958. 2. This affidavit is made as evidence of compliance by the undersigned, and both of them, with the provisions of Paragraph (1) of that certain Restrictive Covenant Contract dated June 2, 1958, and is also made for the purpose and with the intent of inducing NATIONAL LINEN SERVICE CORPORATION to make the payment provided for in Paragraph (2) of said Restrictive Covenant Agreement, dated June 2, 1958. (signed) Louis A. Klitzner (L. S.) Louis A. Klitzner (signed) Harry F. Leshnower (L. S.) Harry F. Leshnower EXHIBIT "B" TO: NATIONAL LINEN SERVICE CORPORATION, 445-47 HIGHLAND AVENUE, N.E., ATLANTA, GEORGIA. Gentlemen: Pursuant to the provisions of Paragraph (3) of *97 that certain Restrictive Covenant Contract dated June 2, 1958, between the undersigned and NATIONAL LINEN SERVICE CORPORATION, the undersigned do hereby request that the annual payment of THIRTY-SEVEN THOUSAND FIVE HUNDRED ($37,500.00) AND 00/100 DOLLARS, if and when the obligation to pay the same is satisfied, shall be paid to the undersigned, as follows: Louis A. Klitzner
$24,375
Harry F. Leshnower
$13,125 and that if paid semi-annually pursuant to said contract, then each of the undersigned to receive fifty (50) per cent of the aforesaid amounts. You are authorized and requested to make such payments, as provided herein, until further notice from the undersigned. This 2nd day of June, 1958. Louis A. Klitzner, Harry F. Leshnower TENNESSEE, COUNTY OF SHELBY] Personally appeared before the undersigned Notary Public, duly authorized to administer oaths under the law, LOUIS A. KLITZNER and HARRY F. LESHNOWER, to me known personally, and known to me to be the persons who executed the within and foregoing affidavit, and who acknowledged in my persence that they executed the within and foregoing affidavit. GIVEN under my hand and seal this 2nd day of June, *98 1958. (signed) Louise Marinus, Notary Public My Commission Expires: 12-4-1960 On June 2, 1958, Textile executed a bill of a sale whereby it sold all of its laundry machinery and equipment to National for $100,400. Attached to the bill of sale was an inventory showing that 597 pieces of laundry equipment had been sold to National. On June 2, 1958, Rental executed a bill of sale whereby it sold all of its trucks and automotive equipment to National for $50,000. Attached to the bill of sale was an inventory showing that 19 delivery vehicles had been sold to National. On June 2, 1958, Klitzner and Leshnower, for a stated consideration of $10, assigned all their right, title, and interest in the negative covenant agreement executed by Robert Breakstone. Under the assignment as of July 1, 1958, National was to assume the monthly payments of $416.67 to Breakstone called for in the negative covenant agreement. On June 2, 1958, petitioners subleased the [*] [*] and occupied by American, Textile, and Rental to National. On June 2, 1958, petitioners executed an indemnity agreement indemnifying and holding National harmless from all claims, demands, causes, and choses in action *99 arising or accrued out of the operation of American prior to that date. All personnel employed by American for picking up and delivering laundered and unlaundered goods executed an employment contract at the time of hiring. The rights of American in all such employment contracts in existence at the time of the sale of American were assigned to National by the bills of sale executed by Klitzner and Leshnower on June 2, 1958. Pursuant to the bills of sale executed by petitioners, Textile, and Rental on June 2, 1958, National drew and delivered to the designated payees the following checks in the amounts shown below: Check
No.
Payee
Amount
4840
Harry F. Leshnower
$190,807.18
4841
Louis A. Klitzner
354,356.18
4842
Textile Maintenance Corp.
100,400.00
4843
American Rental Corporation
50,000.00
In June 1958, T. G. Ware, secretary-treasurer of National, made the following journal entries on its books: Explanation
Linen
A15 Memphis
$ 86,053.62
Linen in use
A50 Memphis
240,000.00
Cabinets
A51 Memphis
50,000.00
Furniture & Fixtures
A64 Memphis
15,000.00
Accounts Receivable
A 7 Memphis
72,000.00
Trade Routes
A90 Memphis
82,109.74
Purchase Assets
B14 Partnership Interest, American Linen Service,
Memphis, Tennessee
$545,163.36
*100 These entries represented an allocation to various accounts of the total price paid to Klitzner and Leshnower. The $86,053.62 allocated to linens represented the new unused linens at American's plant. In the offer of sale, dated May 19, 1958, National stated it would pay 55 percent of the invoice price for new and unused linens. The invoices were supplied by Klitzner and Leshnower to Ware. An inventory was then taken by Ware, personnel of National, and four employees of American. Thereafter, 55 percent of the invoice price of the inventoried linen was allocated by Ware on the books of National as the value of new linen. The $240,000 allocated to linen-in-use by Ware was based upon National's experience in acquiring a number of linen service companies. Because of the extreme difficulty in inventorying dirty linens or linens-in-use, National's practice was to allocate to linens-in-use an amount based upon the monthly volume of business. Its experience in purchasing similar businesses had caused it to conclude that linens-in-use are worth three times the monthly volume of the particular company. However, Klitzner and Leshnower had followed a practice, not prevalent in other cities, *101 of maintaining in their plant an extra day's supply of linen for supplying their customers in the event of a plant breakdown or similar emergency. Because of this extra linen on hand, Ware allocated an amount equal to four times American's monthly volume of business ($60,000). The figure of $50,000 allocated to cabinets was based upon an actual inventory of the cabinets taken by National. Klitzner and Leshnower furnished National with a list of American's furniture and fixtures. The allocation of $15,000 made by Ware to the furniture and fixtures of American was based upon his experience in constantly purchasing such items. The $72,000 allocated to accounts receivable was made from a list of the accounts receivable and their value as furnished to National by Klitzner and Leshnower. The $82,109.74 allocated to trade routes was the difference between the value assigned to the tangible assets, i.e., the new linen, linens-in-use, cabinets, furniture, fixtures, and accounts receivable ($463,053.62), and the total purchase price paid petitioners ($545,163.36). Prior to the time National obtained the covenant not to compete from Klitzner and Leshnower, it had followed the practice *102 of carrying such covenants on its books as capital assets. The covenant obtained from petitioners was the first covenant which was not carried on the books of National as a capital asset. Their covenant was treated by National as a contingent liability. When payments were made to Klitzner and Leshnower pursuant to the covenant, National charged off such payments on its books as a business expense. After June 2, 1958, Klitzner and Leshnower conducted their joint enterprises under the name of K & L Enterprises. The income from the partnership was derived from interest and the rental of buildings in Memphis, Tennessee, and Chattanooga, Tennessee. Klitzner retained his 65 percent interest in the partnership and Leshnower retained his 35 percent interest. On September 30, 1958, Textile and Rental were liquidated and their assets were turned over to Klitzner and Leshnower. Pursuant to the terms of the restrictive covenant, Klitzner furnished National with affidavits prior to June 1, 1959, December 31, 1959, June 1, 1960, and December 31, 1960, wherein he stated that he had complied with the terms of the covenant and had not engaged directly or indirectly in the linen supply business *103 in the area served by American. In return for his compliance with the terms of the covenant, Klitzner received four payments in the following amounts from National during the years in question: Fiscal year ended Feb. 29, 1960
(1)
$24,375.00
(2)
12,187.50
Total
$36,562.50
Fiscal year ended Feb. 28, 1961
(1)
12,187.50
(2)
12,187.50
Total
$24,375.00
Pursuant to the terms of the restrictive covenant, Leshnower furnished National with affidavits prior to June 1, 1959, December 31, 1959, June 1, 1960 and December 31, 1960, wherein he stated that he had complied with the terms of the covenant and had not engaged directly or indirectly in the linen supply business in the area served by American. In return for his compliance with the terms of the covenant, he received four payments in the following amounts during the years in question: 1959
(1) $13,125.00
(2) 6,562.50
Total
$19,687.50
1960
(1) $ 6,562.50
(2) 6,562.50
Total
$13,125.00
Petitioners Louis A. Klitzner and Isabel S. Klitzner attached the following statement to their joint income tax return for their fiscal year ended February 29, 1960: STATEMENT RE COVENANT NOT TO COMPETE
*104 During the year ended February 29, 1960, taxpayer received $36,562.50 from National Linen Service Company which represents his 65% interest in a covenant not to compete entered into in 1958. The entire contract price has been picked up as capital gain in 1958, in a 30-day letter dated October 19, 1959. Therefore, the proceeds received in the current year are not reported on this return. On their income tax return for their fiscal year ended February 28, 1961, petitioners Louis A. Klitzner and Isabel S. Klitzner reported the total payments in the amount of $24,375 received from National Linen as long-term capital gain. Petitioners Harry F. Leshnower and Ruth S. Leshnower attached the following statement to their joint income tax return for 1959: STATEMENT RE COVENANT NOT TO COMPETE In 1959 taxpayer received $19,637.50 from National Linen Service Company which represents his 35% interest in a covenant not to compete entered into in 1958. The entire contract price has been picked up in a 30 day letter dated October 19, 1959, as capital gain in 1958. Therefore the proceeds received in 1959 are not reported on this return. On their return for 1960, petitioners Harry F. Leshnower *105 and Ruth S. Leshnower reported the total payments in the amount of $13,125 received from National Linen as long-term capital gain. In his notices of deficiency for the years in issue the respondent has determined that each of the above-listed payments made to petitioners by National under the covenant not to compete constitute ordinary income to the recipient thereof. Ultimate Finding The covenant not to compete executed by petitioners and National Linen Service Corporation on June 2, 1958, was separately bargained for and was severable from the other assets of American. Opinion The sole question presented by the parties is whether or not certain payments received by petitioners Louis A. Klitzner and Harry F. Leshnower during 1959, 1960, and 1961 pursuant to a restrictive covenant executed June 2, 1958, with National Linen Service Corporation constitute ordinary income or long-term capital gain. The respondent takes the position that petitioners' agreement to refrain from engaging in the linen business in the Memphis area for a period of 10 years and their further agreement to refrain from soliciting National's customers or diverting its business during that period was *106 a contract separately bargained for in good faith and was severable from the sale to National of the assets of American and, therefore, that the payments in question are ordinary income to petitioners under the principles enunciated in such cases as Ullman v. Commissioner, 264 F. 2d 305, affirming 29 T.C. 129; Commissioner v. Gazette Tel. Co., 209 F. 2d 926, affirming 19 T.C. 692; Rodney B. Horton, 13 T.C. 143; and Aaron Michaels, 12 T.C. 17. Petitioners first contend that they sold their partnership interests in American to National, rather than the assets of the partnership, and that, under section 741 of the 1954 Code, [1] they are entitled to report the amounts received under the covenant not to compete as proceeds from the sale of their interests in the partnership, i.e., long-term capital gain. In the alternative, they contend that the sale of their business to National on June 2, 1958, was in fact a sale of partnership assets and that the restrictive covenant was executed for the purpose of protecting the transfer of their goodwill and was thus not severable from the asset transfer, the sale *107 of which resulted in long-term capital gain. See Toledo Newspaper Co., 2 T.C. 794; Toledo Blade Co., 11 T.C. 1079, affd. 180 F. 2d 357, certiorari denied 340 U.S. 811; Ullman v. Commissioner, supra; Aaron Michaels, supra.
Early in the negotiations conducted by petitioners and National Linen, its representative informed Klitzner and Leshnower that the execution of a covenant not to compete was of prime importance to the purchase of the linen service business by National. Petitioners' representative during those negotiations testified on direct examination *108 as follows: Q. Did - who insisted upon the covenant? A. National Linen. Q. Did they insist upon that throughout the negotiations? A. Quite early in the negotiations they stated the desire to have a covenant, yes, sir. The above-quoted statements were supported by the testimony of National Linen's representative: Q. Mr. Haas, during the course of these negotiations was the subject of a covenant not to compete ever discussed? A. It was discussed at great length and in considerable detail. Q. Could you tell me when the covenant was first mentioned? A. I think the covenant was first mentioned at the meeting early in March. I know that it was mentioned when we met in Atlanta on March the 18th, I believe it was, and from then on, but I think it was discussed even prior to that time. National's representative further explained the discussions which took place between the parties concerning the covenant not to compete: Q. The parties have stipulated a covenant not to compete, termed a restricted covenant, in which the $375,000 was allocated or attributed to the covenant. A. That is correct. Q. Could you tell me whether this figure, the final figure, was a result of *109 the negotiations between you and the parties? A. It was. The original figure I proposed to allocate was $250,000. Mr. Seidman pointed out that this would be paid out over a period of 10 years and that they would not be willing to that that figure over 10 years and that is when we changed the figure to $375,000, but it was to be paid $3750 a year and dependent upon their continuing performance of the covenant not to compete. Q. Mr. Haas, during your discussions with Mr. Seidman and with Mr. Klitzner and Mr. Leshnower, did the tax treatment of the covenant not to compete ever come up? A. Yes, it did. The above-described negotiations finally culminated on June 2, 1958, in the execution by petitioners and National Linen Service of a document styled "Restrictive Covenant" under which Klitzner and Leshnower agreed not to compete in the linen service business in the area served by American for a period of 10 years. In return, National agreed to pay Klitzner $24,375 a year and Leshnower $13,125 per year. The payments were to commence on June 1, 1959, and were to be made semiannually thereafter. Before each payment petitioners were required by the agreement to execute an affidavit stating *110 that they had not directly or indirectly solicited or attempted to divert customers away from American and that they had not engaged in the linen supply business in the area served by American during the particular period for which the payment was to be made. With respect to petitioners' first contention that the payments received under their covenant not to compete constitute deferred consideration paid them by National for the purchase of their partnership interests in American, although it is true that under the offer and acceptance executed May 26, 1958, and the bills of sale executed June 2, 1958, they sold their partnership interests to National, we are unable to find support in the record for their conclusion that the payments in question should be characterized as consideration therefor. National's offer to purchase dated May 26, 1958, stated that National offered to buy and that Klitzner and Leshnower agreed to sell their partnership interests for $577,000. The bills of sale executed June 2, 1958, disclosed that the assets of American were transferred to National for $545,163.36. [2] It seems obvious to us that petitioners sold their interests in American for the consideration *111 stated in the bills of sale. If, as they contend, the separately executed covenant not to compete was intended to represent a part of their partnership interest in American, and the payments received under the covenant were in fact partial consideration for the sale of their partnership interests, none of the documents signed by the parties on or about May 26, 1958, or June 2, 1958, even remotely suggest this fact. The restrictive covenant itself contains nothing whatever that would tend to support petitioners' theory that the periodic payments provided therein actually constitute partial consideration for their partnership interests in American. Nor can we find any indication from the testimony presented at the trial that the payments provided under the covenant not to compete were so intended. The consideration paid petitioners *112 for their covenants quite clearly was paid them for their forbearance in refraining from competition with National. We therefore conclude that petitioners' contention on this point is wholly unsupported by the record and must fail for lack of proof. Petitioners further contend that the covenant in question was intended for the protection of the goodwill of American, and that the covenant is so closely related to the goodwill transferred that it is nonseverable therefrom. In support of their contention they rely upon our decision in Aaron Michaels, supra, in which we found as fact that a covenant not to compete executed by the seller of a linen business was ancillary to the sale of goodwill. Because of our view that the covenant there involved was in effect an element of the goodwill transferred to the buyer of the business, we held that it was part of a capital asset and that the payments received for the covenant should be reported as capital gain. Unlike the situation presented in Aaron Michaels, supra, the covenant here in issue was quite obviously severable from the partnership goodwill which petitioners sold to National. The written offers of May 19, 1958, and *113 May 26, 1958, disclose that all the assets of American, both tangible and intangible, were to be purchased by National for a total price of $577,000. As noted above the bills of sale executed June 2, 1958, likewise specifically state that all of the partnership assets were being sold for the consideration stated therein of $545,163.36. We are unable to find any evidence in the record tending to show that the price paid for any of American's assets was fictitious. Insofar as appears from the record, $545,163.36 represented the actual value of all the tangible and intangible assets of American including its goodwill on June 2, 1958. The covenant not to compete executed on June 2, 1958, was separately bargained for, was embodied in a separate written agreement, and was assigned a separate consideration of $375,000. We find no indication that the covenant was intended for the protection of the partnership goodwill which petitioners transferred to National, and we therefore regard our decision in Aaron Michaels, supra, as factually distinguishable from the situation here presented. The record amply supports the respondent's position that the parties in good faith negotiated *114 for and that National in fact acquired from petitioners a covenant not to compete for a period of 10 years which is severable from the other assets purchased from petitioners. It is clear from the record that the parties dealt at arm's length in negotiating for the covenant in question. The linen service business is essentially a personal service business and the sellers here were in a position subsequently to compete by reentering the business in the Memphis area and by contacting former customers. It is apparent that National regarded the inclusion of a covenant not to compete to be indispensable and would not have purchased petitioners' business had such a covenant not been included. The parties were aware of the tax consequences of executing such a covenant. The covenant itself unequivocally establishes that the amounts payable thereunder were intended exclusively as consideration for the forbearance of the sellers. Only if petitioners refrained from competing with American, and only if they executed affidavits to that effect every 6 months would they be entitled to receive any part of the semiannual payments provided therein. The payments were thus made contingent upon the petitioners' *115 continued forbearance. The importance of the contractual provisions in situations such as this has been well expressed by the Court of Appeals for the Second Circuit in Ullman v. Commissioner, supra: when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money. Petitioners have failed to establish that the covenant not to compete executed by Klitzner and Leshnower and National Linen Service Corporation on June 2, 1958, is anything other than what it purports to be. It is abundantly clear to us that the covenant was separately bargained for in an arm's length transaction, and that it is severable from the other assets of American which were transferred *116 to National, and we therefore hold that the consideration received by petitioners thereunder during the years in issue constitutes ordinary income to them pursuant to section 61(a) of the Code. Decisions will be entered under Rule 50. Footnotes
1. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751↩ (relating to unrealized receivables and inventory items which have appreciated substantially in value).
2. The reason for the variation in purchase price as between the offer and acceptance of May 26, 1958, and the bills of sale executed June 2, 1958, is not explained. We assume the price variation is due to adjustments agreed upon by petitioners and National prior to closing pursuant to the terms of the original offer and acceptance of May 19, 1958.↩